IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| ANGELICA J. KAUHAKO, individually and as parent and next friend of her minor child, MARIANA DOE, | CIVIL NO. 13-00567 DKW-BMK |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| STATE OF HAWAII BOARD OF EDUCATION DEPARTMENT OF EDUCATION, NELSON SHIGETA, individually and as principal of Waianae High School, KRISTIN LINDQUIST, individually and as care coordinator of Waianae High School, DOE DEFENDANTS 1-10, | |
| Defendants. | |

STATE OF HAWAII BOARD OF EDUCATION DEPARTMENT OF EDUCATION, NELSON SHIGETA, individually and as principal of Waianae High School, and KRISTIN LINDQUIST, individually and as care coordinator of Waianae High School,

Defendants and
Third-Party Plaintiffs,

vs.

RUSTON TOM; DOE DEFENDANTS
1-10,

       Third-Party Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff Angela Kauhako alleges that Ruston Tom, an adult male special education student, sexually assaulted her minor daughter, Mariana Doe, also a special education student, at Waianae High School while under the care and supervision of the Defendant Department of Education ("DOE"). Defendants – the DOE, School Principal Nelson Shigeta, and Student Care Coordinator Kristin Lindquist – move for summary judgment on the remaining claims against them. The motion is GRANTED with respect to Count III for premises liability, all claims against Shigeta, and for punitive damages against the DOE. Because genuine issues of material fact persist with respect to Kauhako's Title IX and remaining tort claims based on Defendants' alleged knowledge of a prior incident

2

between these students, the motion is DENIED in all other respects, as set forth below.

## BACKGROUND

Although the parties dispute the precise factual chronology, Kauhako alleges that Ruston sexually assaulted Mariana[1] during school hours at least twice during the 2012-2013 school year, including an on-campus incident on April 18, 2013. Of significance to the instant motion is whether and when Defendants had notice of the alleged assaults.

According to Kauhako, "in late October or early November 2012, I found out from Mariana after she came home from school that she and Ruston and a couple of other children had gone off campus and that as they were returning to school Ruston tried to press up against her body and touched her breast." Kauhako Decl. ¶ 4. Kauhako says that, during a telephone call with Lindquist prior to a November 9, 2012 individualized education program ("IEP")[2] meeting, she "mention[ed] to Ms. Lindquist that Mariana had gone off campus with Ruston and a couple of other kids." Kauhako Decl. ¶ 5. Lindquist purportedly responded that

---

[1] The Court adopts the parties' use of certain first names to aid in clarity.

[2] Special education students receive instruction pursuant to an IEP that is specifically tailored to each student's needs and updated annually. When Mariana began attending Waianae, her IEP dated March 28, 2012 was the controlling plan for her education. Lindquist Decl. ¶¶ 4-5, Ex. A.

3

Kauhako could bring up her concerns relating to this incident at the IEP meeting. Kauhako Decl. ¶ 6. Kauhako states, that at the IEP meeting scheduled for November 9, 2012, but held on November 13, 2012, "I brought up the off-campus incident, and I said I don't know what exactly happened, but Mariana told me that Ruston had tried to press against her body and touched her breast when they were walking back to the school campus." Kauhako Decl. ¶ 9.

She claims that she also told Lindquist and Geri Martin, a vice principal, that she was concerned that Mariana was allowed to walk around campus without supervision. Kauhako requested that the school provide one-on-one supervision to Mariana during school hours because she could not be left unattended due to her vulnerability. Kauhako Decl. ¶ 10. According to Kauhako, "their response to my concerns was they did not need to provide a one-on-one aide because Mariana was somewhat getting one-on-one already, and said they would have Mariana stay close to the class during recess." Kauhako Decl. ¶ 11. She claims that she was not completely satisfied with this response at the November 13, 2012 meeting, but that she was assured by Lindquist that "Mariana would be watched at all times" and that she did not have to worry. Kauhako Decl. ¶ 13.

The IEP Meeting Report generated by the DOE does not reflect any discussion at the meeting of Kauhako's concerns that Mariana had gone off

4

campus with Ruston, which prompted Kauhako to request a one-on-one aide.

Defs.' Ex. C. Kauhako asserts that the report is "not entirely accurate." Kauhako

Decl. ¶ 14. The report notes that Kauhako "voiced some concerns about the peers

that Mariana spends time with" but it stops short of documenting the specific

concerns Kauhako claims to have raised about Mariana being touched

inappropriately by Ruston. Kauhako Decl. ¶ 15.

The DOE recounts a different version of the events in late 2012. According

to Lindquist, early in the school year, she realized that Mariana needed more

instruction in social skills, because at recess, Mariana would wander to the 9th

grade regular education area and the 9th grade girls would make fun of her. As a

result, during non-class times, Lindquist would not allow Mariana to go outside a

small area close to the classroom so that Lindquist could more closely monitor her.

Lindquist Decl. ¶¶ 6-7. On October 30, 2012, the school sent Kauhako a notice

regarding Mariana's annual IEP meeting, originally scheduled for November 9,

2012. Lindquist Decl. ¶ 8, Ex. B. At the November 13, 2012 IEP meeting,

Lindquist contends that Kauhako did not raise any concerns about a sexual assault

on Mariana. She asserts that the only concern raised was protecting Mariana from

negative interactions with other students who made fun of her. Lindquist Decl.

¶ 10. According to Lindquist, Kauhako was concerned "about the peers that

Mariana spends time with," which Lindquist understood to mean Mariana's interactions with the regular education students and her classmates who had behavioral challenges.  Lindquist Decl. ¶ 10, Ex. C.

The DOE contends that it was not until December 4, 2012 that Mariana and Ruston went off campus before school to a nearby food establishment – rather than sometime prior to the November 13, 2012 IEP meeting.  According to Lindquist, when they returned to campus, they were counseled about not leaving campus during the school day.  Mariana never told Lindquist that anything "bad had happened either when they went off campus or when they returned."  Lindquist Decl. ¶ 11.  Lindquist claims that this was the only time she was aware of that Mariana and Ruston went off campus.  Lindquist Decl. ¶¶ 11-12.  On December 5, 2012, Dean of Students, Dean Shimada, notified Kauhako about the off campus trip by telephone, and during that conversation, Kauhako did not express any concerns about Mariana.  Shimada Decl.  ¶¶ 4-5.  Lindquist also insists that at no time "either before or after December 4, 2012 did Mariana or [Kauhako] ever tell me that Mariana had been subjected to any inappropriate behavior by any other student."  Lindquist Decl. ¶ 11.

On April 12, 2013, several students in Lindquist's class—including Mariana, Ruston, and other students named Ashley, and Kaniela—volunteered to work at a

school musical program.  Kauhako also attended this function.  Lindquist Decl.

¶ 18.  On April 15, 16, and 17, Mariana and Ruston both attended school and

behaved normally.  According to Lindquist, nothing indicated that either student

had engaged in or experienced inappropriate behavior or been harmed.  Lindquist

Decl. ¶¶ 20-21.  According to Kauhako, however –

> My daughter reported that a rape had occurred in the co-ed
> bathroom at school during school hours.  She said that it
> happened on Mon (4/15/13), Tues (4/16/13), and Wed.
> (4/17/13) and that no one knew anything until Ruston and she
> were approached by her school teacher on April 18th after
> Ruston was "looking like he did something wrong," according
> to Ms. [Lindquist].

Kauhako Ex. 1 (11/28/2014 Answers to Interrogatories) at 9.

On April 18, 2013, a little after 8:00 a.m., Educational Assistant ("EA")

Patricia Sofa gave Mariana permission to use the bathroom.  Ruston was still in the

classroom when Sofa gave Mariana permission to go.  Declaration of Patricia Sofa

("Sofa Decl.") ¶ 5.  According to Sofa, Mariana was gone from the classroom for

"about ten minutes or less.  Before Mariana came back into the classroom, [Sofa]

looked outside and saw that Mariana was talking to Taylor near our classroom.

Taylor is another student in our classroom."  Sofa Decl. ¶ 8.

During the time that Mariana was out of the classroom, EA Joann DeCambra

gave Ruston permission to go to the bathroom.  According to DeCambra,

"[b]ecause I could see the urgency of his need to go, I gave him permission.  When I gave Ruston permission to go to the bathroom, I knew that Mariana had just left the classroom to go to the bathroom also."  Declaration of Joann DeCambra ("DeCambra Decl.") ¶ 5.  DeCambra explained that—

> Ruston (and the other boys in our classroom) used a bathroom that was farther away from our classroom and in the opposite direction of the bathroom in the agricultural complex (the "AG bathroom").  The AG bathroom was close to our classroom and was used by the agriculture students and another classroom of students with severe disabilities.  When Ruston went to the bathroom, he always used the bathroom farther away from our classroom that the boys were supposed to use.  When I gave Ruston permission to go to the bathroom, I assumed that he would use his regular bathroom and never thought that he would use the AG bathroom.

DeCambra Decl. ¶ 6.  Ruston came back to the classroom quickly and was not gone for more than five minutes.  DeCambra Decl. ¶ 7.

Kauhako claims that Ruston went into the AG bathroom while Mariana was in it and sexually assaulted her.  Kauhako Ex. 1 (11/28/2014 Answers to Interrogatories).[3]  When Ruston returned to the classroom on April 18, 2013, he

---

[3]According to Kauhako, Mariana asked Lindquist for permission to use the bathroom on April 18, 2013.  She states that, as Mariana walked to the bathroom, Ruston followed her and did not say anything.  *See* Kauhako Ex. 2 (11/28/2014 Answers to Interrogatories).  Kauhako asserts that –

> After she came out of the bathroom and washed her hands, Ruston grabbed her and took off her clothes.  He said, "Can I have sex with you?"

appeared distraught to Lindquist, and she immediately spoke with him.  As a result of this conversation, she "felt that something may have happened" so she "took care of Mariana and Ruston, and then notified Dean Shimada[.]"  Lindquist Decl. ¶ 19.  According to Shimada, after he learned "that something may have happened between Mariana and Ruston, [he] ensured that the two students were separated at school.  Ruston was sent home and not allowed to return to school."  Shimada Decl. ¶ 8.[4]  Shimada called the Honolulu Police Department ("HPD") to report a possible incident involving students, and an HPD officer came to the school to speak with Mariana.  Shimada Decl. ¶ 7.  At 9:32 a.m., Shimada called Kauhako to inform her of a possible incident at school.  According to Shimada, during this telephone conversation, Kauhako told him that "Mariana had gone off campus in the past and that something similar had happened."  Shimada Decl. ¶ 6.  Shimada declares that this was the first time that he had been told of prior incidents "involving inappropriate conduct toward Mariana at school."  Shimada Decl. ¶ 6.

---

> Mariana said, "no."  She was still standing.  He said, "Can you unzip your pants?" and Mariana said, "no."  Ruston went ahead and unzipped her pants (she was wearing jeans) and pulled her jeans and panty down to her ankles.  Then Ruston pulled down his pants.  Mariana asked, "What are you doing?" and Ruston said, "Let me show you."  Then he showed her his penis.  Then he had sex with her while they were still standing up.

Kauhako Ex. 2 at 2.
[4]In early May 2013, Ruston returned to school and was placed in a different classroom than Mariana.  Shimada Decl. ¶ 8.

On April 18, 2013, Shimada accessed the security camera videos of the door to the AG bathroom.   He reviewed the security video from April 18, 2013.  That video showed that Mariana and Ruston did not use the AG bathroom at the same time on April 18, 2013.  Shimada's review of the security camera video showed that, at 8:05:10 a.m., Mariana went to the door of the AG bathroom and then turned around and left the area.  Approximately forty seconds later, 8:05:50 a.m., Ruston went to the door of the AG bathroom, latched it open and went in.  Ruston came out of the bathroom approximately one minute and 20 seconds later.  No other person entered the bathroom while Ruston was there.  Shimada Decl. ¶¶ 14-15.  Shimada also reviewed the security camera footage from April 15, 16, and 17.  According to Shimada, this footage did not show Mariana and Ruston using the AG bathroom at the same time on any of these days.  Shimada Decl. ¶ 16.

With respect to school accommodations, Lindquist explains that Mariana was allowed to go to the restroom on campus alone, but the teacher or educational assistants in the classroom would keep track of the time that Mariana was gone.  Lindquist Decl. ¶¶ 14-15.  According to school officials, there is a bathroom used by both male and female students in the Agriculture Complex ("AG Complex") with showers, and its original purpose was for agriculture students who got

muddied during the day and needed to clean up.  Declaration of Lei Aken ("Aken Decl.") ¶ 4.  Male and female agriculture students may use this bathroom, but are not allowed to use it at the same time.  Aken Decl. ¶ 6.

Since 2008, the AG bathroom has also been used by special education students with severe disabilities.  These disabled male and female students may use this bathroom at the same time depending on necessity and scheduling with the agriculture students.  However, when these disabled students use the bathroom, they are always accompanied by an adult and are supervised.  Declaration of Jenine Ibanez ("Ibanez Decl.") ¶¶ 4-6.  When the special education students use the AG bathroom, they close the outside door, and the agriculture students know that a special education student is using the bathroom and that they must wait until the special education student comes out.  Aken Decl. ¶ 8.  Mariana was allowed to use the AG bathroom because it was close to her classroom, and Mariana needed to use the restroom often during the day.  Lindquist Decl. ¶ 15.  Ruston also was allowed to go to the restroom on campus alone, and Lindquist or the EAs in the classroom would keep track of the time that Ruston was gone to the restroom.  Lindquist Decl. ¶ 17.  According to Lindquist, Ruston and Mariana were not supposed to use the same restroom on campus, nor were any of the male students in Lindquist's

classroom allowed to use the same restroom as the female students.  Lindquist Decl. ¶ 13.

Defendants attest that they were never notified by Kauhako of any problems or concerns of inappropriate or improper behavior towards Mariana by another student or by any school staff.  Shigeta Decl. ¶ 5; Shimada Decl. ¶¶ 5-12; Lindquist Decl. ¶¶ 7, 10-11, 26-27.  According to Lindquist, she was never informed by any one that "Mariana had been harassed, abused, or molested, as alleged in the First Amended Complaint.  If I were ever to find out that Mariana was harmed in any way, I would have immediately taken action to end the alleged improper behavior and to ensure her safety."  Lindquist Decl. ¶27.

Both Lindquist and Shimada claim that Ruston was a good student who never caused any problems at school.  Neither would have expected him to engage in any inappropriate behavior.  *See* Shimada Decl. ¶ 17; Lindquist Decl. ¶¶ 22-25. Lindquist taught Ruston for several years, and explained that he is a high-functioning student, particularly in the social area.  Lindquist Decl. ¶ 23. According to Lindquist –

> Because Ruston was a model student and always polite and well-behaved, I would never suspect him of doing anything to any other student that would be harmful or inappropriate.  I never saw him engage in any behavior that was inappropriate, either sexual or otherwise.  I never had any complaints from

12

anyone about any improper behavior from Ruston.  I never had any indication or reason to believe that Ruston required any extra or special supervision.

Lindquist Decl. ¶ 25.

Kauhako seeks damages from the DOE, and Shigeta and Lindquist in their individual capacities, alleging that Defendants had notice of sexual assaults against Mariana prior to April 18, 2013, and that they placed Mariana in a dangerous situation by allowing both male and female special education students to use the AG bathroom.

The Court previously granted Defendants judgment on the pleadings with respect to several counts – Count II (Section 1983); Count IV (Sexual Assault and Battery); Count VI (Negligent Hiring, Training and/or Supervision); Count IX (Willful and Wanton Conduct/Reckless Disregard); and Count XII (*Respondeat Superior*, Agency Liability and/or Vicarious Liability) – and the duplicative claims against Shigeta and Lindquist in their official capacities.  Kauhako's Title IX claim (Count I) and premises liability claim (Count III) remain against the DOE only. The following tort claims also remain: negligent supervision (Count V), negligence (Count VII), gross negligence (Count VIII), intentional infliction of emotional distress ("IIED") (Count X), and negligent infliction of emotional distress ("NIED") (Count XI).  Kauhako also seeks punitive damages.

Defendants move for summary judgment on all remaining claims.

## STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## DISCUSSION

## I.   Count I: Title IX

The DOE argues that it is entitled to summary judgment on Count I for violation of Title IX because it was not deliberately indifferent to known acts of sexual harassment and because Mariana suffered no loss of educational opportunity.  The statute provides, in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).  In order to state a prima facie case under Title IX that is predicated on a student's sexual harassment, a plaintiff must allege that: (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to educational opportunities or benefits; (2) the defendant had actual knowledge of the sexual harassment; and (3) the

14

defendant was deliberately indifferent to the harassment.  *See Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000); *Lopez v. Regents of University of Cal.*, 5 F. Supp. 3d 1106, 1120-22 (N.D. Cal. 2013).

The Court first addresses the DOE's contention that it did not have adequate notice of the offending conduct and that it was not deliberately indifferent.  Where a Title IX claim is predicated on a student's sexual harassment, notice on the part of the federal funding recipient is critical because "it is the deliberate failure to curtail known harassment, rather than the harassment itself, that constitutes the intentional Title IX violation."  *Mansourian v. Regents of University of Cal.*, 602 F.3d 957, 967 (9th Cir. 2010) (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641 (1999)).  "The actual notice requirement under Title IX is satisfied where an 'appropriate official possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based.'"  *Lopez*, 5 F. Supp. 3d at 1122-23 (quoting *Folkes v. N.Y. College of Osteopathic Medicine*, 214 F. Supp. 2d 273, 285 (E.D.N.Y. 2002)).

According to the DOE, there is no evidence that anyone at the school was notified that Mariana was allegedly attacked on or before December 4, 2012.  *See Mem.in Supp. at 12-13.  And although the DOE was aware of the December 4,

15

2012 off-campus incident, which it promptly reported to Kauhako, there is no evidence of any sexual misconduct associated with that incident.  In fact, the DOE contends that, other than the events of April 18, 2013, there is no evidence that Lindquist, Shigeta, Shimada, or anyone else at the school had any notice that Mariana had been subject to sexual harassment, sexual abuse, or sexually inappropriate behavior.

According to Kauhako, however, she did tell Lindquist about an earlier incident involving Mariana and Ruston.  Kauhako claims that, "in late October or early November 2012, I found out from Mariana after she came home from school that she and Ruston and a couple of other children had gone off campus and that as they were returning to school Ruston tried to press up against her body and touched her breast."  Kauhako Decl. ¶ 4.  Kauhako says that, during a telephone call with Lindquist prior to the November IEP meeting, she told Lindquist "that Mariana had gone off campus with Ruston and a couple of other kids."  Kauhako Decl. ¶ 5.  Lindquist purportedly responded that Kauhako could bring up her concerns relating to this incident at the IEP meeting.  Kauhako Decl. ¶ 6.  Kauhako states that at the IEP meeting, "I brought up the off-campus incident, and I said I don't know what exactly happened, but Mariana told me that Ruston had tried to

press against her body and touched her breast when they were walking back to the school campus." Kauhako Decl. ¶ 9. Lindquist disputes this version of events.

Lindquist contends that Kauhako did not raise any concerns about a sexual assault on Mariana either before or during the November 13, 2012 IEP meeting. She asserts that the only concern raised was protecting Mariana from negative interactions with other students who made fun of her. Lindquist Decl. ¶ 10. According to Lindquist, Kauhako was concerned "about the peers that Mariana spends time with," which Lindquist understood to mean Mariana's interactions with the regular education students and her classmates who had behavioral challenges. Lindquist Decl. ¶ 10, Ex. C. The DOE insists that the record shows that it was not until December 4, 2012 that Mariana and Ruston went off campus before school to a nearby food establishment – rather than sometime prior to the November 13, 2012 IEP meeting – and when they returned to campus, Mariana never told her teachers that anything "bad had happened either when they went off campus or when they returned." Lindquist Decl. ¶¶ 11-12; Shimada Decl. ¶ 4. Lindquist declares that at no time "either before or after December 4, 2012, did Mariana or [Kauhako] ever tell me that Mariana had been subjected to any inappropriate behavior by any other student." Lindquist Decl. ¶ 11.

Kauhako maintains that Lindquist's statements in the IEP meeting reports and in Lindquist's declaration regarding the lack of notice and about a sexual assault or any other inappropriate sexual behavior towards Mariana are "not accurate."  Kauhako Decl. ¶¶ 7-8.  In opposition to the motion, Kauhako presented sworn testimony that she told Lindquist that Mariana and Ruston had been off campus sometime before the November IEP meeting, and that Ruston had tried to press against Mariana's body and touched her breast when they were walking back to the school campus.  The DOE, however, points to Kauhako's deposition testimony, in which she stated that there was only one time that Mariana went off campus, and that Kauhako found out about that incident when the school contacted her in December 2012.  *See* Defs.' Ex. E (Kauhako 4/27/15 Dep. Tr. at 88).  At this stage of the litigation, the Court is mindful that "reasonable minds could differ as to the import" of Kauhako's deposition testimony, *see Anderson v. Liberty Lobby*, 477 U.S. 242, 250-51 (1986), and that the evidence and inferences from it, when viewed favorably to her, are sufficient to support a Title IX claim.

If a jury were to believe the version of events set forth in Kauhako's declaration, a reasonable jury could find that Defendants were both on notice and acted with deliberate indifference.  "Deliberate indifference is found if the school administrator responds to known peer harassment in a manner that is clearly

18

unreasonable." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135 (9th

Cir. 2003) (citing *Davis*, 526 U.S. at 649).  Failure to take any steps to investigate

and stop the harassment would support a finding of deliberate indifference.  *Id*. at

1135-36; *see also Monteiro v. Tempe Union High Sch. Dist.,* 158 F.3d 1022, 1034

(9th Cir. 1998).

Viewing the record in the light most favorable to Kauhako—as the Court

must at this time—Defendants were arguably aware of the conduct occurring

between the same actors during school hours in relatively close temporal proximity

to the alleged April 18, 2013 sexual assault.  The Court does not make credibility

determinations or weigh conflicting evidence at the summary judgment stage.  *See*

*Nelson v. City of Davis*, 571 F.3d 924 (9th Cir. 2009) ("[C]redibility

determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge.") (citations

omitted).  Although it is uncertain whether Kauhako can ultimately prove

deliberate indifference by the DOE, at this stage of the proceedings, she provided

sufficient evidence to create issues of fact warranting a trial on the merits.  *See*

*Anderson*, 477 U.S. at 251-52 (stating that summary judgment requires

determination of "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). Accordingly, summary judgment is denied.

The Court also concludes that Kauhako has raised a triable issue of lost educational opportunity. Kauhako avers that Mariana suffered severe sexual harassment and assault at the hands of another student. *See Doe v. Galster*, 768 F.3d 611, 618 (7th Cir. 2014) (Noting that "violent physical attacks . . . added up to severe or pervasive harassment that denied Doe equal access to educational benefits or opportunities. These attacks could qualify as 'objectively offensive.'") (citing *Davis*, 526 U.S. at 650). Mariana also missed school on Friday, April 19, 2013 for a physical examination at the Sex Abuse Treatment Center, the day after the alleged sexual assault. Kauhako Exs. 4 (4/19/13 Medical Form) & 5 (4/13 Calendar). She also attended 28 counseling sessions during the school day, over a 21-month period, for treatment of post-traumatic stress disorder and other symptoms following the alleged sexual assault. Kauhako Ex. 6 (5/29/15 Lynch Dep. Tr. at 177-182). These schools absences, which Kauhako traces to the alleged sexual assault, could be said to have deprived Mariana of access to educational opportunities or benefits. *See, e.g.*, *Davis*, 526 U.S. at 651 ("[a] plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims'

20

educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities."); *id.* at 654 (Reversing dismissal of complaint where plaintiff alleged that "harassment had a concrete, negative effect on her daughter's ability to receive an education."); *Murrell v. School District No. 1*, 186 F.3d 1238, 1248 (10th Cir. 1999) (Finding that a complaint sufficiently alleged severe harassment where the victim was sexually assaulted for a month, eventually hospitalized, and then rendered homebound by the abuse.); *cf. Al-Rifai v. Willows Unified Sch. Dist.*, 469 F. App'x 647, 649 (9th Cir. 2012) (Affirming dismissal of Title IX claim against school district where the "specific allegations amount to simple teasing and name-calling—for which Title IX damages are not available."). Here, the Court concludes that genuine issues of material fact preclude summary judgment on this point as well.

The Court observes that a jury could reasonably reject liability under Title IX and is mindful that the DOE has offered evidence that would support a verdict in its favor. For example, the testimony of Lindquist and Shimada contradict Kauhako's account, and IEP meeting notes and Shimada's call logs corroborate the DOE's version of events. However, that the DOE has presented evidence in its defense does not undermine the Court's conclusion that there is a genuine dispute

21

that requires resolution by a jury.  Accordingly, Defendants' motion is DENIED as to Count I.

## II.   **Count III: Premises Liability**

The DOE argues that it is entitled to summary judgment on Count III, for premises liability, in which Kauhako alleges that the school maintained an unreasonably dangerous condition: allowing both male and female special education students to use the AG bathroom, knowing that one of the male students "preyed on a female special education student who by her obvious limitations was extremely vulnerable and defenseless."  Mem. in Opp. at 11.

In order to maintain a claim based on premises liability, Kauhako must establish that a condition existed at the school which posed an unreasonable risk of harm, and that the DOE failed to take reasonable steps to eliminate that risk or to adequately warn users about it.  *See Corbett v. Ass'n of Apartment Owners of Wailua Bayview Apartments*, 70 Haw. 415, 417, 772 P.2d 693, 695 (1989)).  The DOE argues that because (1) there was no unsafe condition; and (2) it had no notice of any unsafe condition, there were no "steps" that it was obligated to take.

The DOE contends that there is no "co-ed" bathroom as alleged in the complaint.  The AG bathroom is not accessed by male and female students simultaneously.  Male and female agriculture students use it at separate times and

22

are strictly segregated by gender.  Aken Decl. ¶¶ 6-10.  The AG bathroom is also used by severely disabled students, who are not high functioning, whose classroom is two doors away in the AG complex.  Ibanez Decl. ¶¶ 4-5.  Because the AG bathroom is near their classroom, the severely disabled students, both male and female, sometimes use this restroom accompanied by an adult aide.  Some of these students will also use the AG bathroom shower facilities or to change clothes because of the nature of their disabilities.  Ibanez Decl. ¶¶ 6-7.  The majority of the special education students in Lindquist's class, however, were higher functioning and able to use the restroom unaccompanied, including Mariana and Ruston.  Because Mariana used the bathroom more frequently than her other students, Mariana was allowed into the AG bathroom that was closer to Lindquist's classroom.  When she would leave to go to the bathroom, the teachers would keep track of how long she was gone.  Lindquist Decl. ¶¶ 13-15.  Other students in Mariana's class did not have permission to use the AG bathroom, including Ruston.

In opposition, Kauhako does not set forth facts demonstrating that the school maintained a co-ed bathroom that created an unreasonably dangerous condition.  Instead, Kauhako argues that "Defendants knew or should have known that designating only a single bathroom [for] both male and female special education

students was a recipe for disaster for Mariana Doe . . . .  By creating that situation, Defendants placed Mariana in a dangerous situation, which they themselves created."  Mem. in Opp. at 11.  There is no evidence, however, that the DOE designated a single bathroom for both male and female special education students to access unaccompanied by an adult aide.

The DOE also contends that it had no notice of any unsafe condition arising from the AG bathroom facility usage.        The owner or occupant of land will be liable "if the owner or occupant was previously put on actual or constructive notice of an unreasonably unsafe condition that caused the injury."  *Mohler v. Kipu Ranch Adventures, LLC*, 2014 WL 5817538, at *8 (D. Haw. Nov. 7, 2014) (citations omitted).  Viewing the facts in the light most favorable to Kauhako, there is no evidence before April 18, 2013 of any incident occurring in the AG bathroom to give the DOE actual or constructive notice of the alleged dangerous condition.  Quite simply, Kauhako presents zero evidence on this point; hence, there is no question of fact regarding any unsafe condition that "existed for such a period of time that the owner or occupant should have been able to detect it through the exercise of reasonable diligence."  *Id.*  Kauhako, the nonmoving party "cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."  *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d

24

1107, 1112 (9th Cir. 2003).  Because she fails to establish a genuine issue of fact

that a condition existed at the school which posed an unreasonable risk of harm,

the DOE is entitled to summary judgment on Kauhako's premises liability claim.

Accordingly, Defendants' motion is GRANTED as to Count III.

## III.   <u>Claims Against Shigeta</u>

The record demonstrates that Principal Shigeta did not play a direct role in

any of the events alleged in the complaint.  According to Shigeta, prior to April 18,

2013, he was never notified of any problems or concerns regarding Mariana.  He

was notified by Vice-Principal Shimada about the incident involving Mariana and

Ruston on April 18, 2013.  Shigeta Decl. ¶ 5.  He did not attend any of Mariana's

IEP meetings or speak with Kauhako.  His uncontroverted declaration is clear on

this point: "While I was Principal at [Waianae High School], I did not have any

personal contact with [Kauhako] regarding her daughter, Mariana."  Shigeta Decl.

¶ 4.  He is also clear that "[n]o one ever informed me that Mariana had been

harassed, abused or molested, as alleged in the First Amended Complaint."

Shigeta Decl. ¶ 8.

In opposition to the motion, Kauhako states only: "I was told by the school

that whenever an incident report is made, Principal Nelson Shigeta is provided a

copy and informed of the matter.  [T]his is why I disagree with Ms. Lindquist's

25

statement in paragraph 6 of her June 9, 2015 declaration that at no time did I ever request or tell her that Mariana should have a one-on-one aide at school."

Kauhako Decl. ¶¶ 17.  At her deposition, Kauhako responded that she does not remember if she ever spoke to Shigeta or not.  Defs.' Ex. E (Kauhako 4/27/15 Dep. Tr. at 68-69).  In the absence of any genuine issue of fact regarding his personal involvement or knowledge of events sufficient to support a finding of liability, Defendants' motion is GRANTED as to Shigeta.

## IV.   <u>Remaining Tort Claims</u>

### A.   <u>Counts V, VII, VIII, and XI: Negligence Claims</u>

Defendants move for summary judgment on Count V (Negligent Supervision), Count VII (Negligence), Count VIII (Gross Negligence), and Count XI (NIED), arguing that they did not breach any duty owed to Kauhako or Mariana.  As a preliminary matter, the Court observes the DOE's duty, recognized under Hawaiʻi state law, standing *in loco parentis*, to take reasonable steps to prevent reasonably foreseeable harms to its *students*.  *Doe Parents No. 1 v. State, Dep't of Educ.*, 100 Hawaiʻi 34, 74, 58 P.3d 545, 585 (2002).  Because the Court finds that genuine issues of fact exist as to whether Defendants had notice of specific previous sexual harassment, the motion is denied with respect to these negligence-based claims.

26

1.    **Count V: Negligent Supervision**

The DOE acknowledges its duty to protect students from foreseeable harms that schools reasonably should anticipate.  Mem. in Supp. at 20.  It argues, however, that it has no duty to "monitor" or "control" its students, nor did it breach a duty in this case where "there was no notice to the State that could possibly allow the State to foresee that Ruston would [allegedly] commit an intentional act."  *Id.* at 21.  According to his teachers, Ruston was a model student, and there was no reason to believe that he required special supervision.  *See* Lindquist Decl. ¶¶ 17, 22-25; DeCambra Decl. ¶ 8.  Moreover, Mariana was closely supervised, and Lindquist denies any prior knowledge that she had been harmed by Ruston.  *See* Lindquist Decl. ¶¶ 26-27 ("When Mariana was in my classroom at school, I did all that I could do to make sure that she was safe.  No one ever informed me that Mariana had been harassed, abused or molested, as alleged in the First Amended Complaint.  If I were ever to find out that Mariana was harmed in any way, I would have immediately taken action to end the alleged improper behavior and to ensure her safety.").

Kauhako, however, avers that she told Lindquist before the November 2012 IEP meeting that Mariana and Ruston went off campus, and that Ruston had tried to press against Mariana's body and touched her breast.  According to Kauhako,

27

she asked for the one-on-one adult aide to provide Mariana extra supervision to ensure her safety, which the DOE maintained was not necessary.  Kauhako Decl. ¶¶ 4-14; Kauhako Ex. 1.  Although the DOE disputes this account, the Court must view the evidence in the light most favorable to the non-moving party.  With this standard in mind, the Court concludes that a jury could find that because the DOE either knew or "reasonably should have foreseen that a particular student would harm another, it [owed] a duty specifically to supervise either the assailant or the student [allegedly] harmed by him." *Doe Parents No. 1*, 100 Hawai'i at 80, 58 P.3d at 591 (citing *Kim v. State*, 62 Haw. 483, 492, 616 P.2d 1376, 1382 (1980)).  Accordingly, a triable issue of fact exists regarding whether Defendants' conduct fell short of its duty to reasonably supervise students.  Defendants' motion is DENIED as to Count V.

### 2. <u>Counts VII and VIII: Negligence and Gross Negligence</u>

Defendants seek summary judgment on Kauhako's negligence and gross negligence claims, arguing no legal duty was breached with respect to the alleged sexual assault in the AG bathroom.  In order to succeed on a claim for negligence, a party must show:

> 1. A duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks.

28

2. A failure on [the actor's part] to conform to the standard required . . .

3. A reasonable close causal connection between the conduct and the resulting injury . . .

4. Actual loss or damage resulting to the interests of another . . .

*White v. Sabatino*, 415 F. Supp. 2d 1163, 1173 (D. Haw. 2006) (citation omitted).

In order to succeed on a claim for gross negligence a party must show "that there has been an entire want of care" which raises a presumption of conscious indifference to consequences." *Mullaney v. Hilton Hotels Corp.*, 634 F. Supp. 2d 1130, 1154 (D. Haw. 2009).

> Gross negligence "is simply a point on a continuum or probability, and its presence depends on the particular circumstances of each case." *Royal Ins. Co. of Am.*, 194 F.3d at 1015 (internal citation and quotation omitted); *Pancakes of Hawaiʻi, Inc.*, 85 Hawaiʻi at 293, 944 P.2d 83 ("The element of culpability that characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence." (internal citation and quotation omitted)).

*Smallwood v. NCsoft Corp.*, 730 F. Supp. 2d 1213, 1234 (D. Haw. 2010).

Kauhako creates triable issues of fact on her claims for negligence and gross negligence. There is no dispute that a duty of care is owed to the DOE's students. *See Victor v. Koga*, 131 Hawaiʻi 253, 317 P.3d 697 (App. 2014) (discussing the

DOE's statutory duty to protect its students from reasonably foreseeable harm, and the special relationship with its students, which obligates the DOE to exert reasonable care in ensuring each student's safety and welfare, as would a reasonably prudent parent) (citing *Doe Parents*, 100 Hawai'i at 79180, 58 P.3d at 590-91).  The record is disputed, however, with respect to whether Defendants had notice of any reasonably foreseeably harm and whether the duty was breached for purposes of Kauhako's negligence claims.  Although Lindquist swears that she took extra steps to ensure that Mariana was safe at school, Kauhako presents evidence that she told Lindquist that Mariana was sexually harassed and/or assaulted by Ruston prior to or at the November 2012 IEP meeting, but that the school took no action on this specific report.   Kauhako sufficiently raises an issue of fact demonstrating Defendants' "entire want of care," and raising a presumption of "conscious indifference to consequences."  *Mullaney*, 634 F. Supp. 2d at 1154.  In other words, if the jury were to believe Kauhako's version of events, it could reasonably conclude that Defendants were grossly negligent based upon "indifference to a present legal duty and utter forgetfulness of legal obligations so far as other persons may be affected."  *Pancakes of Haw.*, 85 Hawai'i at 293, 944 P.2d at 90.  Defendants' motion is DENIED as to Count VII and Count VIII.

### 3.   Count XI: Negligent Infliction of Emotional Distress

Defendants ask the Court for judgment on Kauhako's negligent infliction of emotional distress ("NIED") claim because the "State has no duty to be an insurer of its students' safety," and because no duty to Mariana or Kauhako has been breached.  The elements of a claim for NIED are: (1) the defendant engaged in negligent conduct; (2) the plaintiff suffered serious emotional distress; and (3) such negligent conduct of the defendant was a legal cause of the serious emotional distress.  *Caraang v. PNC Mortgage*, 795 F. Supp. 2d 1098, 1122 (D. Haw. 2011).  A cognizable claim for NIED under Hawai'i law also "requires physical injury to either a person or property," *Calleon v. Miyagi*, 76 Hawai'i 310, 320, 876 P.2d 1278 (1994), or a mental illness.  *See* HRS § 663-8.9.  The Hawai'i Supreme Court has held with respect to claims for NIED that –

> an NIED claim is nothing more than a negligence claim in which the alleged actual injury is wholly psychic and is analyzed utilizing ordinary negligence principles.  Further, this court has 'consistently held, as a general matter, that the plaintiff must establish some predicate injury either to property or to another person in order himself or herself to recover for [NIED].'
>
> *Kaho'ohanohano v. Dep't of Human Serv.*, 117 Hawai'i 262, 306-07, 178 P.3d 538, 582-83 (2008) (citing *Doe Parents No. 1 v. Dept. of Educ.*, 100 Hawai'i 34, 69, 58 P.3d 545, 580 (2002)) (alteration in original) (internal citations omitted).

*Smallwood v. NCsoft Corp.*, 730 F. Supp. 2d 1213, 1235 (D. Haw. 2010).

For the reasons discussed above with respect to Kauhako's other negligence-based claims, her NIED claim survives the present motion. Genuine issues of material fact exist with respect to whether any duty was breached under the specific disputed circumstances of this case. With respect to the required injury, the record would support a reasonable jury finding of both serious emotional distress and physical injury to Mariana and Kauhako. *See* Kauhako Ex. 1 (11/28/2014 Answers to Interrogatories) at 10; Ex. 3 (Lee 5/27/15 Dep. Tr. at 21-32); Ex. 6 (Lynch 5/29/15 Dep. Tr. at 182-83). Accordingly, Defendants' motion is DENIED as to Count XI.

### B.   Count X: Intentional Infliction of Emotional Distress

Defendants seek summary judgment on Count X, which alleges that "Defendants' wrongful conduct constitutes intentional infliction of emotional distress." Complaint ¶ 69. "The elements of the tort of intentional infliction of emotional distress are 1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another." *Hac v. Univ. of Haw.*, 102 Hawai'i 92, 106-07, 73 P.3d 46, 60-61 (2003) (adopting IIED standard from Restatement (Second) of Torts).

Defendants first argue that there is no evidence of any intentional or reckless act on the part of any state defendant.  In *Nelsen v. Research Corp. of the University*, 805 F. Supp. 837, 851-52 (D. Haw. 1992), the court explained that as to the first prong, "[r]ecklessness requires that defendant must know, or have reason to know, the facts which create the risk."  *See also Nagata v. Quest Diagnostics Inc.,* 303 F. Supp. 2d 1121, 1126 (D. Haw. 2004) (observing that the first element of a claim for IIED had been broadened to include the definition of reckless as articulated in *Nelsen*); *Ritchie v. Wahiawa Gen. Hosp*., 597 F. Supp. 2d 1100, 1110 (D. Haw. 2009) ("To demonstrate the first element, a plaintiff must show that the defendant acted either with a 'desire to inflict severe emotional distress, . . . where he knows that such distress is certain, or substantially certain, to result from his conduct' or 'recklessly . . . in deliberate disregard of a high degree of probability that the emotional distress will follow.'") (quoting Restatement (Second) Torts Section 46, cmt. i (1965)).

The Court finds that issues of material fact exist as to whether Lindquist recklessly caused Mariana to suffer severe emotional distress.  Although the record is disputed, as discussed above, Kauhako presents evidence that she told Lindquist about Ruston's alleged prior sexual assault, but that the school took no action on her report.  A jury could find that Lindquist had reason to know that there was a

degree of risk that her acts or omissions would cause serious harm to Mariana, and

that she disregarded that risk.  Accordingly, a reasonable jury could find that

Lindquist's conduct was reckless, thereby satisfying the first element of an IIED

claim.

To the extent Defendants argue that the alleged conduct is not sufficiently

outrageous, the Court agrees that the issue is a close one.  The Restatement

describes what constitutes "outrageous" conduct:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46, cmt. d. (1965).  "The question whether the

actions of the alleged tortfeasor are . . . outrageous is for the court in the first

instance, although where reasonable persons may differ on that question it should

be left to the jury." *Nagata v. Quest Diagnostics Inc.,* 303 F. Supp. 2d 1121, 1127

(D. Haw. 2004); *see also Hughes v. Mayoral,* 721 F. Supp. 2d 947, 964-65 (D.

Haw. 2010). Courts have found that "sexually harassing behavior, racial slurs, and accusations of criminal conduct could all possibly be considered outrageous conduct," *see Nagata*, 303 F. Supp. 2d at 1128 (citing *Lapinad v. Pacific Oldsmobile-GMC, Inc*., 679 F. Supp. 991, 996 (D. Haw. 1988)), and conduct that does not fit into any of these categories may still raise a question of fact. *Cf. id.* (determining that defendant's delay in disclosing error in drug test could be considered outrageous).

On balance, the Court finds that issues of material fact exist as to whether Lindquist's failure to act on Kauhako's purported request for action at the November 2012 IEP meeting rose to the level of outrageous conduct. Construing the evidence in the light most favorable to Kauhako, the Court determines that a reasonable juror could find that the reported failure to investigate or follow up on Kauhako's report to Lindquist regarding the earlier trip off-campus—that reportedly included sexual assault and harassment by Ruston of Mariana—which culminated in the alleged April 18, 2013 sexual assault and allegedly caused Mariana to suffer post-traumatic stress disorder, is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See* Restatement (Second) of Torts § 46, cmt. d. That is particularly so given

Mariana's unique disabilities and vulnerability, of which the State was aware.

Defendants have not established that, viewing the evidence in the light most favorable to Kauhako, the conduct is not outrageous as a matter of law.

Accordingly, Defendants' motion is DENIED as to Count X.

### C.    Claims Against Lindquist Not Barred by Conditional Privilege

Lindquist seeks summary judgment on the state tort claims based on the qualified or conditional privilege recognized under Hawaiʻi law.  A governmental official performing a public duty enjoys the protection of what has been termed a qualified or conditional privilege.  *See Towse v. Hawaii*, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982).

> For a tort action to lie against a nonjudicial government official, the injured party must allege and demonstrate by clear and convincing proof that the official was motivated by malice and not by an otherwise proper purpose.  *Towse*, 647 P.2d at 702-03; *Medeiros*, 522 P.2d at 1272.  When a public official is motivated by malice, and not by an otherwise proper purpose, Hawaii law provides that the cloak of immunity is lost and the official must defend the suit the same as any other defendant.  *Marshall v. Univ. of Haw.*, 821 P.2d 937, 946 (Haw. Ct. App. 1991), abrogated on other grounds by *Hac v. Univ. of Haw.*, 73 P.3d 46 (Haw. 2003).
>
> The existence or absence of malice is generally a question for the jury.  *Runnels*, 525 P.2d at 1129.  However, when the existence or absence of malice is demonstrated to the court via uncontroverted affidavits or depositions, the court may rule on the existence or absence of malice as a matter of law.  *See id.*

36

*Edenfield v. Estate of Willets*, 2006 WL 1041724, at *11-12 (D. Haw. Apr. 14, 2006).  The Supreme Court of Hawai'i has held that "the phrase 'malicious or improper purpose' should be defined in its ordinary and usual sense."  *Awakuni v. Awana*, 115 Hawai'i 126, 140-41, 165 P.3d 1027, 1041-42 (2007) (considering "actual malice" to determine immunity in the context of an alleged breach of fiduciary duty); *Edenfield*, 2006 WL 1041724, at *12 (considering "actual malice" to determine immunity for claims of assault, battery, intentional infliction of emotional distress and negligent infliction of emotional distress); *Ogden v. County of Maui*, 554 F. Supp. 2d 1141, 1153 (D. Haw. 2008) (considering "actual malice" to determine immunity for a negligence claim).

Malice is "the intent, without justification or excuse, to commit a wrongful act, reckless disregard of the law or of a person's legal rights, and ill will; wickedness of heart." *Awakuni*, 115 Hawai'i at 141, 165 P.3d at 1042 (quoting Black's Law Dictionary 976 (8th ed. 2004)) (internal quotation marks omitted). The Court notes that conduct performed with "reckless disregard of the law or of a person's legal rights" may be negligent, even though negligent conduct often does not involve malice.  *See, e.g., Long v. Yomes*, 2011 WL 4412847, at *7-*8 (D. Haw. Sept. 20, 2011).

37

Based on the previous discussion of Lindquist's potential tort liability, a reasonable jury could find that she acted in reckless disregard of the law when, according to Kauhako, Lindquist was told of a specific risk of harm to Mariana based on a previous incident, but failed to take any action responsive to that risk.   Accordingly, because genuine issues of material fact remain, Defendants' motion is DENIED with respect to Lindquist's assertion of the state law conditional privilege.

## V.   __Punitive Damages__

Finally, Defendants seek summary judgment on Kauhako's request for punitive damages.  Because Kauhako's IIED and gross negligence claims survive summary judgment, the Court denies the derivative request for summary judgment as to Lindquist, the remaining individual capacity defendant.  *See Kang v. Harrington*, 59 Haw. 652, 660, 587 P.2d 285, 291 (1978) ("An award of punitive damages is purely incidental to the cause of action."); *see also Lee v. Aiu*, 85 Hawai'i 19, 34, 936 P.2d 655, 670 (1997) (holding record contained substantial evidence that defendants engaged in the type of "aggravated or outrageous misconduct" required to impose punitive damages where IIED claim also stood); *Durham v. County of Maui*, 692 F.Supp.2d 1256, 1262 (D. Haw. 2010) ("the

standard for punitive damages encompasses gross negligence, which is the entire

want of care raising the presumption of indifference to consequences").

Punitive damages, however, are not available against the DOE.  *See* HRS

§ 662-2; *see also Doe ex rel. Doe v. State of Hawaii Dep't of Educ.*, 351 F. Supp.

2d 998, 1019 (D. Haw. 2004) ("[U]nder the [Hawaii State Tort Claims Act], the

State of Hawaii explicitly retains its sovereign immunity as to punitive damages.");

*Jones v. Beverly Hills Unified Sch. Dist.*, 2010 WL 1222016, at *6 (C.D. Cal. Mar.

24, 2010) (punitive damages not available under Title IX); *Mansourian v. Bd. of

Regents*, 2007 WL 3046034, at *13-*14 (E.D. Cal. Oct. 18, 2007) (same), reversed

on other grounds, *Mansourian v. Regents of the Univ. of Cal.*, 602 F.3d 957 (9th

Cir. Cal. 2010).  Accordingly, Defendants' motion is DENIED with respect to

Lindquist and GRANTED with respect to the DOE.

## <u>CONCLUSION</u>

Defendants' Motion for Summary Judgment is GRANTED in part as to

Count III, all claims against Defendant Nelson Shigeta, and for punitive damages

against the State.  The motion is DENIED in all other respects

The following claims remain for trial: Count I against the DOE (Title IX);

Count V (Negligent Supervision); Count VII (Negligence); Count VIII (Gross

Negligence); Count X (IIED); and Count XI (NIED).

39

IT IS SO ORDERED.

Dated: September 9, 2015 at Honolulu, Hawai'i.



_____
Derrick K. Watson
United States District Judge

_____
_Kauhako v. State of Hawaii_; CV 13-00567 DKW-BMK; **ORDER GRANTING
IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**